**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARSH & MCLENNAN AGENCY, LLC, | Index No. 1:26-cv-5002 |
| Plaintiff, | **COMPLAINT** |
| v. | |
| JOHN CARTER, MARIA NOLT, and MEREDITH PARKER BUCHANAN, | |
| Defendants. | |

Plaintiff Marsh & McLennan Agency, LLC. ("Plaintiff" or "MMA"), by and through its undersigned counsel, files this Complaint against Defendants John Carter ("John"), Maria Nolt ("Nolt"), and Meredith Parker Buchanan ("Buchanan") (collectively, "Defendants" or "Former Employees"), alleges as follows:

## INTRODUCTION

1.      This action involves claims by MMA against the Former Employees arising out of their blatant disregard of their contractual and other legal obligations to MMA and breaches of duty of loyalty. MMA is forced to take action due to the significant threat Defendants pose to MMA by and through their wrongful solicitation of MMA employees, and wrongful solicitation and servicing of MMA clients. Moreover, despite representations that the Former Employees would abide by their covenants, they continue to violate them by soliciting and servicing restricted MMA clients.

2.      By no coincidence, the Former Employees' actions were motivated by their employment by Lockton. Lockton is engaged in a corporate raid on MMA, and its related entities, officers, employees, and clients, achieved by their orchestrating of a targeted exodus of key employees from MMA's Birmingham office. Recently, MMA's Birmingham office has lost at least

three other employees, in addition to the Former Employees, and at least five clients with associated recurring annual revenue in an amount not readily calculable but far in excess of $450,000. And it stands much more to lose.

3.　In November 2024, MMA completed the acquisition of McGriff Insurance Services LLC ("McGriff"), a significant move that expanded MMA's capabilities and market presence in the United States. This acquisition included McGriff's Specialty unit, which comprises teams of insurance professionals focused on complex client accounts operating in certain industry segments. The integration with McGriff strengthened MMA's expertise and service offerings in industry specific insurance markets, enhancing its position in Birmingham, among other key jurisdictions.

4.　MMA undertook significant time, effort, and expense to acquire McGriff and capture a strong Alabama presence. As the acquisition was completing, Lockton set its sights on stealing the business that MMA lawfully obtained.

5.　Lockton built its Birmingham presence largely by poaching teams of employees from its direct competitors, including MMA and before it McGriff. After unlawfully soliciting these employee teams, Lockton then deploys its new employees to steal key clients of its competitors by using its competitors' confidential and trade secret information, usurping the goodwill the competitors developed with the clients. Lockton knows that this unlawful business practice causes the subject employees to breach their restrictive covenants and expects that it will be sued over their conduct.

6.　This unlawful scheme is well-documented. Since 2006, Lockton has been a defendant in dozens of lawsuits, all brought by Lockton competitors like MMA, making similar allegations to those here.[1]

---

[1] *See USI Insurace Services LLC v. Elisia Hahnenberg, Southeast Series of Lockton Companies,*1:25-cv-1995 (N. D. Ga. 2025); *Aon PLC v. Lockton Companies, LLC* 2024-CH-10431 (Circuit Ct. Cook Cnty. 2024); *HUB Int'l Midwest*

7.     Lockton first built its Birmingham office by poaching a team of employees from McGriff, including but not limited to Brad Ainsworth and by poaching MMA's clients through unlawful solicitation[2]. Lockton's Birmingham office is in large part comprised of former McGriff and MMA employees.  Seemingly undeterred, Lockton is at it again.

---

*Ltd. v. Midwest Series of Lockton Companies LLC, et al.,* No. 24-0899-IV (Tenn. Cir. Ct., Davidson County 2024); *HUB Int'l Midwest Ltd. v. Lockton Companies LLC, et al.*, No. 3:24-cv-871 (M.D. Tenn. 2024); *Koo v. Pacific Series of Lockton Companies, LLC, et al., No. 24CV013675 (Cal. Super. Ct., Sacramento County 2024); McClave c. Lockton Companies, LLC*, 24-cv-013675 (Sup. Ct., Sacramento Cnty. 2024); *Lawrence v. Lockton Companies, LLC – Pacific Series, et al.*, No. 24STCV08927 (Cal. Super. Ct., Los Angeles County 2024); *Pastorius v. Lockton Companies LLC – Pacific Series*, No. 24STCV11627 (Cal. Super. Ct., Los Angeles County 2024); *Alliant Insurance Services Inc. v. Lockton Companies, LLC – Pacific Series, et al.*, No. 24STCV11487 (Cal. Super. Ct., Los Angeles County 2024); *Canales v. Lockton Companies, LLC – Pacific Series, et al.*, No. 23STCV24107 (Cal. Super. Ct., Los Angeles County 2023); *Roderick v. Lockton Companies, LLC – Pacific Series, et al.*, No. 23STCV24101 (Cal. Super. Ct., Los Angeles County 2023); *Racunas v. Lockton Companies, LLC – Pacific Series*, No. 23STCV24054 (Cal. Super. Ct., Los Angeles County 2023); *Neporent v. Lockton Companies, LLC – Pacific Series*, No. 23STCV24089 (Cal. Super. Ct., Los Angeles County 2023); *Mazie, et al. v. Lockton Companies, LLC – Pacific Series*, No. 23STCV24083 (Cal. Super. Ct., Los Angeles County 2023); *Byun, et al. v. Lockton Companies, LLC – Pacific Series*, No. 23STCV24139 (Cal. Super. Ct., Los Angeles County 2023); *Barnes v. Lockton Companies, LLC – Pacific Series, et al.*, No. 23STCV24040 (Cal. Super. Ct., Los Angeles County 2023); *Azzarello v. Lockton Companies, LLC – Pacific Series, et al.*, No. 23STCV29777 (Cal. Super. Ct., Los Angeles County 2023); *Nguyen v. Lockton Companies LLC – Pacific Series, et al.*, No. 30-2023-01348302 (Cal. Super. Ct., Orange County 2023); *Douglas, et al. v. Lockton Companies LLC – Pacific Series*, No. 30-2023-01337927 (Cal. Super. Ct., Orange County 2023); *Willis Towers Watson Northeast Inc. v. Northeast Series of Lockton Companies LLC, et al.*, No. 652571/2022 (N.Y. Sup. Ct., New York County 2022); *USI Insurance Services LLC v. Cahoon, et al.*, No. 22-2-03054-2 (Wash. Super. Ct., King County 2022); *Kaufman v. Lockton Companies, LLC – Pacific Series, et al.*, No. 22STCV23460 (Cal. Super. Ct., Los Angeles County 2022); *Marsh USA Inc. v. Millett, et al.*, No. 1:22-cv-6656 (S.D.N.Y. 2022); *Mercer Health & Benefits LLC v. Brown, et al.*, No. 1:22-cv-3844 (S.D.N.Y. 2022); *Hylant Group Inc. v. Wolfe, et al.*, No. CI0202103515 (Ohio Ct. Com. Pl., Lucas County 2021); *Willis Towers Watson CAC, Inc. v. Matta,* No. 21-cv-23036 (S.D. Fla. 2021); *Arthur J. Gallagher & Co. v. Filewicz,* No. 21-cv-522 (E.D. Pa. 2021); *Mark Edwards Partnes LLC v. Cosgrove,* 20-cv-3766 (LTS)(SLC) (S.D.N.Y. 2020); *Willis Re Inc. v. Littlel,* No. 19-cv-9087 (VEC) (S.D.N.Y. 2019); *USI Ins. Servs. Nat'l, Inc. v. Lockton Cos., LLC*, No. 17-cv-02895 (M.D. Fla. 2017); *USI Ins. Servs. Nat'l, Inc. v. Lockton Cos.*, LLC, No. 18-cv-00158 (N.D. Ill. 2018); *USI Ins. Servs. Nat'l, Inc. v. Lockton Cos.*, LLC, No. 17-cv-02711 (D. Kansas 2017); *USI Ins. Servs., LLC v. Lockton Cos., LLC,* No. 17-cv-09946 (JMF) (S.D.N.Y. 2017); *USI Ins. Servs., LLC v. Lockton Cos.*, LLC, No. 17-cv-09948(RA) (S.D.N.Y. 2017); *USI Ins. Servs., LLC v. Lockton-Dunning Series of Lockton Cos., LLC*, No. 17-cv-03389-M (N.D. Tex. 2017); *USI Ins. Servs. Nat'l Inc. v. Lockton Cos., LLC*, No. 17-cv-01842 (W.D. Wash. 2017); *Wells Fargo Ins. Servs. USA, Inc. v. Galioto*, No. 17-cv-04588 (D. Minn. 2017); *Willis of Seattle Inc. v. Walton*, No. 17-2-08461-1 (Wash. Superior Ct., King Cnty. 2017); *Tompkins Ins. Agencies, Inc. v. Sumner*, No. CV 16-2217, 2016 WL 3345452, at *1 (E.D. Pa. June 15, 2016); *Graham Co. v. Keith*, No. 14-cv-06128 (E.D. Pa. 2014); *Marsh & McLennan Agency LLC v. Houstoun*, Index No. 651521/2012 (N.Y. Sup. Ct., N.Y. Cnty. 2012); *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 766 (Tex. 2011); *Willis Grp. Holdings Public Ltd Co. v. Cummings*, Index No. 652603/2011 (N.Y. Sup. Ct., N.Y. Cnty. 2011); *Aon Corp. v. Haskins*, No. 09-cv-03531 (D. Minn. 2009); *Palmer & Cay of Ga., Inc. v. Lockton Cos., Inc*., 280 Ga. 479, 479, 629 S.E.2d 800, 801 (2006); *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326 (S.D.N.Y. 2018).

[2] *See McGriff Insurance Services v. Brand Ainsworth*, *Amanda Brannen Southeast Series of Lockton Companies, LLC, and Texas Serious of Lockton Companies, LLC*, 01-CV-2021-900854 (Jefferson Cnty. 2021).

3

8.      John Carter, a Vice President and Producer at MMA, with the service professionals who worked with him on MMA clients, Buchanan, Nolt, and Jennifer Reagin ("Reagin") each resigned effective January 14, 2026. All immediately joined Lockton.  Buchanan, Nolt and Reagin tendered their resignations near-simultaneously with copycat resignation letters.  Despite his long tenure and senior position with McGriff then MMA, Carter did not even bother to ensure that MMA received his resignation; MMA had to learn about it through a LinkedIn post from Lockton announcing his hire.

9.      The Former Employees strategically coordinated their resignations from MMA  in a manner calculated to cause maximum impact and disruption to MMA's workforce and its clients. Carter was a long-tenured producer at McGriff and then MMA in Birmingham.  The book of business he had at MMA was largely ceded to him by other McGriff/MMA producers rather than originated by himself.  Knowing the value of the service professionals that MMA staffed on the accounts he was tied to, Carter solicited and induced key Account Executives, Buchanan, Nolt, and Senior Account Manager Reagin to leave with him to Lockton so he could better ensure the loss of clients to MMA once he landed at Lockton.  The transition would be seamless for clients, if Carter could ensure the service team came with.

10.      With the assistance and encouragement of Lockton, the Former Employees engaged in an organized scheme to solicit and steal MMA's Birmingham business in breach of their individual contractual commitments and other legal obligations to MMA.

11.      Immediately following their resignations, Former Employees on behalf of Lockton began to call upon, solicit, accept, engage in, service or perform business of the same type or kind as the business performed by MMA from or with respect to MMA clients with whom they formerly worked. For example, Carter was in contact with an MMA client over LinkedIn just days after

announcing his departure for Lockton. In addition, without authorization from MMA, immediately after announcing her departure, Buchanan began calling MMA clients, telling them she was leaving MMA, and telling at least one client that a group of employees left MMA for Lockton, disparaging MMA in the process.

12. The Former Employees' unlawful actions immediately bore fruit. As noted above, since the Former Employees' departures, Defendants have successfully converted at least five MMA clients—accountable for nearly a half-million dollars in annually recurring revenue—to leave MMA and join Lockton. Upon information and belief, the wrongful solicitations, acceptance of business, and servicing of restricted clients are ongoing.

13. Moreover, Lockton, through the Former Employees, have solicited and continue to solicit several key MMA employees to join Lockton. The key employees that Lockton and the Former Employees have attempted to solicit, not coincidentally, have relationships with some of MMA Birmingham's largest clients and/or the largest books of business. To date, their efforts to improperly solicit MMA's employees and clients continues.

14. This Court should recognize the Former Employees' unlawful scheme and bring it to a halt and award the compensation justly owed to MMA for their actions.

## THE PARTIES

15. MMA is a Delaware limited liability company with its principal place of business located at 360 Hamilton Avenue, Suite 930, White Plains, New York 10601. It is a leader in insurance and employee benefits brokerage and managements services.

16. MMA's sole member is Marsh USA LLC. ("Marsh Risk"), a Delaware corporation with its principal place of business located at 1166 Avenue of the Americas, New York, New York 10036.

17.     Both MMA and Marsh Risk are subsidiaries of Marsh & McLennan Companies, Inc. ("Marsh"), a Delaware corporation with its principal place of business located at 1166 Avenue of the Americas, New York, New York 10036.

18.     As noted above,  MMA completed the acquisition of McGriff , a significant move that expanded MMA's capabilities and market presence in the United States. This acquisition included McGriff's Specialty unit, which comprises teams of insurance professionals focused on complex client accounts operating in certain industry segments.  The integration with McGriff strengthened MMA's expertise and service offerings in industry specific insurance markets, enhancing its position in Birmingham, among other key jurisdictions.

19.     As of November 15, 2024, MMA became successor-in-interest to McGriff and the employer of McGriff's employees, including Carter, Buchanan, Nolt and Reagin.

20.     Defendant John Carter is an adult individual whose permanent home and residence is, upon information and belief, 111 Crestview Road, Birmingham Alabama 35213.  Carter was Senior Vice President at MMA. On January 14, 2026, he resigned to work for Lockton, as Lockton's Vice President.

21.     Defendant Maria Nolt is an adult individual whose permanent home and residence is, upon information and belief, 2194 Rose Lane, Hellertown, Pennsylvania, 18055. Nolt was Marketing Account Executive at MMA. On January 14, 2026, Nolt resigned to work for Lockton as Senior Account Executive.

22.     Defendant Meredith Parker Buchanan is an adult individual whose permanent home and residence is, upon information and belief, 3401 Coventry Drive, Vestavia Hills, Alabama 35243. Buchanan was Marketing Account Executive at MMA. On January 14, 2026, Buchanan resigned to work for Lockton as Senior Account Executive.

**JURISDICTION AND VENUE**

23.    The Court has jurisdiction over this action under 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs. MMA is a citizen of Delaware and New York. Defendants Carter and Buchanan are domiciled in Alabama and therefore citizens of Alabama. Defendant Nolt is domiciled in Pennsylvania and therefore a citizen of Pennsylvania.

24.    By signing and accepting the terms of their binding agreements with MMA, all Defendants expressly agreed to this Court's jurisdiction over this action and of personal jurisdiction over them. The agreements specifically state that:

> The parties, being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement and Employee's employment shall be brought exclusively in the Civil Court of the City of New York, New York County, or in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York, or in any other court of competent jurisdiction in or for the State and County of New York, and the parties agree to the personal jurisdiction thereof.

25.    Defendants are all subject to personal jurisdiction in New York given that they engaged in intentional and tortious conduct that was directed at MMA, knowing it is located in New York, and calculated to harm MMA in New York. MMA, whose principal place of business is New York, is damaged and continues to be damaged by Defendants' conduct in New York.

26.    This Court also has specific personal jurisdiction over each of the Defendants because they regularly conduct business in the State of New York, including with MMA, which maintains its primary place of business in New York.

27.    Venue is also proper in this District because MMA maintains its principal place of business in this District and a substantial part of the events or omissions giving rise to MMA's

claims occurred here: (1) the contracts that Defendants are breaching were negotiated in New York; (2) Defendants owed duties to their New York-based employer; (3) MMA learned of the breaches in New York; (4) MMA was harmed and continues to face the risk of additional immediate harm in New York as it deals with the operational and financial impact of the resignations; and (5) MMA maintains some of the Confidential Information and Trade Secrets (as defined in the Former Employees' Non-Solicitation and Confidentiality Agreements with MMA) relevant to its claims in this action in New York—including business records that form a basis for MMA's claims.

28.    New York law applies to the claims against Defendants pursuant to the terms of their agreements with MMA.

## FACTUAL BACKGROUND

29.    MMA serves middle market and large corporate clients with a broad range of commercial property and casualty products and services, as well as solutions for employee health and benefits, retirement and administration needs, and a growing personal lines business in the United States and Canada. MMA also provides advice on insurance program structure and market dynamics, along with industry expertise and transactional capability. Since its first acquisition in 2009, MMA has invested in the acquisition of over 125 agencies, including its November 2024 acquisition of McGriff. As of November 15, 2024, MMA became successor-in-interest to McGriff and the employer of McGriff employees, including the Former Employees who were responsible for complex large client accounts in specialty areas and tied to MMA's Birmingham, Alabama office.

30.    MMA employees have access to and rely upon the confidential and proprietary information and/or trade secrets of MMA and its affiliates to provide these services.

31.     Over the years, MMA has invested significant time, millions of dollars, and goodwill building a robust insurance brokerage business within Alabama and the rest of the United States, including with its acquisition of McGriff.

32.     All the Former Employees had access to MMA's Confidential Information. As a Vice President and Producer for MMA, Carter had access at the highest levels to the most sensitive Confidential Information, including Confidential Information related to MMA's strategic business initiatives and compensation related to Buchanan, Nolt, and Reagin.

33.     MMA protects its Confidential Information, including by requiring employees to execute Non-Solicitation and Confidentiality Agreements that define MMA's Confidential Information (which includes clients' confidential information) and describe employees' obligations to safeguard it.

34.     This commercially sensitive Confidential Information is vital to MMA's collective success and its employees' individual success, as information about prospective clients, competitive pricing, and growth opportunities are of paramount importance in this highly competitive industry. Such detailed, proprietary information provides MMA and its employees with significant competitive advantages. MMA went to great lengths at enormous expense to collect and refine this information to benefit its business relative to its competitors, giving it a strong competitive advantage.  And this information is not generally known to the public or readily ascertainable.

**MMA Protected its Legitimate Business Interests With Reasonable Restrictive Covenants that the Departing Employees Freely and Voluntarily Entered.**

35.     It is common in the competitive insurance brokerage and risk management industries, and related consulting services, to require top employees to execute restrictive covenants as terms and conditions of employment.

9

36.     The Former Employees executed binding and enforceable agreements with McGriff that imposed necessary and reasonable restrictions. MMA is a successor-in-interest to those agreements.

37.     In connection with MMA's acquisition of McGriff, the Former Employees were eligible to receive substantial retention and incentive compensation awards.  Eligibility for those awards was contingent upon the signing of additional restrictive covenant agreements that supplemented the obligations he already agreed to in their McGriff agreements which MMA acquired.

38.     As detailed below, the additional restrictive covenant agreements were executed in November 2024 in connection with the Former Employees receiving substantial retention bonuses.

39.     Because of its position in the industry and prior engagements with MMA and Marsh, Lockton is aware of MMA's restrictive covenant obligations and practices, which are substantially similar to Lockton's own.

**Carter's Employment with McGriff, MMA and His Execution of Contracts with MMA**

40.     In 2006, Carter began employment as a Producer for McGriff, Seibels & Williams, Inc. ("MSW"), an affiliate of McGriff.

41.     In connection with his employment with McGriff, Carter signed an employment agreement containing restrictive covenants. A copy of the Employment Agreement between Carter and McGriff (the "Carter Employment Agreement") is attached as **Exhibit A**.

42.     By signing the Carter Employment Agreement, Carter agreed that for two years following his separation from employment he would not, "directly or indirectly, on his own behalf or on behalf of others, contact, solicit, make sales to, service or attempt to procure business from any client or prospective client (as defined hereafter) of McGriff. *See* Exhibit A, ¶ 4. (internal citations omitted).

43.    Carter also agreed that for two years following his separation from employment he would not, "disclose or use for the purpose of competing with [McGriff], either directly or indirectly, or aid anyone else by disclosing to any third party, either directly or indirectly, all or any prat of any [McGriff] Confidential Information. *See* Exhibit A, ¶ 9.

44.    In exchange for being granted access to McGriff's Confidential Information and in consideration of his employment, Carter agreed in the Carter Employment Agreement that he would, "treat as confidential all trade secrets and confidential information received in the course of this employment, and shall not disclose such information during such employment or hereafter; nor shall [Carter] disclose or use such secrets or information in any subsequent employment." *See* Exhibit A, ¶ 2.

45.    Carter acknowledged that these restrictions in the Carter Employment Agreement are reasonable and necessary to protect McGriff's legitimate interests. *See* Exhibit A, ¶ 6

46.    The Carter Employment Agreement also clarified that it bound any successor of McGriff. *See* Exhibit A, ¶ 9.

47.    Leading up to the completion of the merger between MMA and McGriff, in connection with and in consideration for Carter's eligibility to receive a retention bonus with MMA, Carter entered into a Non-Solicitation and Confidentiality Agreement (the "Carter NSA") with MMA effective as of the date of the closing of the acquisition by MMA of McGriff. A copy of the Carter NSA is attached as **Exhibit B**.

48.    By signing the Carter NSA, Carter agreed for a period of two years following the end of his employment, that he would not, directly or indirectly: (i) solicit clients or prospective clients of MMA for the purpose of selling or providing products or services of the type sold or provided by Employee while employed by MMA; (ii) induce clients or prospective clients of

11

MMA to terminate, cancel, not renew, or not place business with MMA; (iii) perform or supervise the provision or performance of services or projects or provision of products of the type sold or provided by Employee while he or she was employed by MMA on behalf of any clients or prospective clients of MMA; or (iv) assist others to do the acts. Exhibit C to Exhibit B, ¶ 1(b).

49.     Carter also agreed that, both during employment with MMA and for a period of two (2) years thereafter, he would not, either on his own account or on behalf of any person, company, corporation, or other entity, directly or indirectly, solicit, or endeavor to cause any employee of MMA to leave employment with MMA. Exhibit C to Exhibit B, ¶ 2.

50.     By signing the Carter NSA, Carter also agreed that, for so long thereafter as the pertinent information or documentation remains confidential, he would not, for any purpose whatsoever, directly or indirectly use, disseminate or disclose to any other person, organization or entity Confidential Information or Trade Secrets, except as required to carry out his duties as an employee of MMA. Exhibit C to Exhibit B, ¶ 5(a).

51.     The Carter NSA provides that the restrictive periods set forth therein shall not expire and shall be tolled during any period in which Carter is in violation of such restrictive periods, and therefore such restrictive periods shall be extended for a period equal to the durations of Carter's violations thereof. Exhibit C to Exhibit B, ¶ 10(b).

52.     The Carter NSA is governed by and construed in accordance with the laws of State of New York. Exhibit C to Exhibit B, ¶ 15.

53.     As consideration for the Carter NSA, Carter was offered continued employment and a substantial retention award. *See* Exhibit B §4 and Exhibit A to Exhibit B.

**Nolt's Employment with McGriff, MMA and Her Execution of Contracts with MMA**

54.     In 2017, Nolt began employment as a Marketing Account Executive for MSW.

55.     Leading up to the completion of the merger between MMA and McGriff, in connection with and in consideration for Nolt's eligibility to receive a retention bonus with MMA, Nolt entered into a Non-Solicitation and Confidentiality Agreement (the "Nolt NSA") with MMA effective as of the date of the closing of the acquisition by MMA of McGriff. A copy of the Nolt NSA is attached as **Exhibit C**.

56.     By signing the Nolt NSA, Nolt agreed for a period of two years following the end of her employment, that she would not, directly or indirectly: (i) solicit clients or prospective clients of MMA for the purpose of selling or providing products or services of the type sold or provided by Employee while employed by MMA; (ii) induce clients or prospective clients of MMA to terminate, cancel, not renew, or not place business with MMA; (iii) perform or supervise the provision or performance of services or projects or provision of products of the type sold or provided by Employee while  she was employed by MMA on behalf of any clients or prospective clients of MMA; or (iv) assist others to do the acts. Exhibit C to Exhibit C, ¶ 1(b).

57.     Nolt also agreed that, both during employment with MMA and for a period of two (2) years thereafter, she would not, either on his own account or on behalf of any person, company, corporation, or other entity, directly or indirectly, solicit, or endeavor to cause any employee of MMA to leave employment with MMA. Exhibit C to Exhibit C, ¶ 2.

58.     Nolt also agreed that, for so long thereafter as the pertinent information or documentation remains confidential, she would not, for any purpose whatsoever, directly or indirectly use, disseminate or disclose to any other person, organization or entity Confidential Information or Trade Secrets, except as required to carry out her duties as an employee of MMA. Exhibit C to Exhibit C, ¶ 5(a).

13

59.    The Nolt NSA provides that the restrictive periods set forth therein shall not expire and shall be tolled during any period in which Nolt is in violation of such restrictive periods, and therefore such restrictive periods shall be extended for a period equal to the durations of Nolt's violations thereof. Exhibit C to Exhibit C, ¶ 10(b).

60.    The Nolt NSA is governed by and construed in accordance with the laws of State of New York. Exhibit C to Exhibit D, ¶ 15.

61.    As consideration for the Nolt NSA, Nolt was offered continued employment and a significant retention bonus. *See* Exhibit C §4 and Exhibit A to Exhibit C.

**Buchanan's Employment with McGriff, MMA and Her Execution of Contracts with MMA**

62.    In 2015, Buchanan began employment as a Marketing Account Executive for MSW.

63.    In connection with her employment with McGriff, Buchanan signed an employment agreement containing restrictive covenants. A copy of the Employment Agreement between Buchanan and McGriff (the "Buchanan Employment Agreement") is attached as **Exhibit D**.

64.    By signing the Buchanan Employment Agreement, Buchanan agreed that for a period of two years following the end of her employment, she would not, on behalf of herself or on behalf of any other person or entity, solicit, divert, or take away, or attempt to solicit, divert or take away, on his or her behalf or on behalf of any business in competition with McGriff, any McGriff Customer or McGriff Prospective Customer for the purpose of engaging in any Competitive Activity. Exhibit D, ¶ 6(a)(iii).

65.    Buchanan also agreed by signing the Buchanan Employment Agreement, that for a period of two years following the end of her employment, she would not disclose or use for the purpose of competing with Employer, either directly or indirectly, or aid anyone else by disclosing

14

to any third party, either directly or indirectly, all or any part of any Confidential Information. Exhibit D ¶ 9.

66.    Buchanan acknowledged that these restrictions in the Buchanan Employment Agreement are reasonable and necessary to protect McGriff's legitimate interests. *See* Exhibit D, ¶ 6(c).

67.    Leading up to the completion of the merger between MMA and McGriff, in connection with and in consideration for Buchanan's eligibility to receive a retention bonus with MMA, Buchanan entered into a Non-Solicitation and Confidentiality Agreement (the "Buchanan NSA") with MMA effective as of the date of the closing of the acquisition by MMA of McGriff. A copy of the Buchanan NSA is attached as **Exhibit E**.

68.    By signing the Buchanan NSA, Buchanan agreed for a period of two years following the end of her employment, that she would not, directly or indirectly: (i) solicit clients or prospective clients of MMA for the purpose of selling or providing products or services of the type sold or provided by Employee while employed by MMA; (ii) induce clients or prospective clients of MMA to terminate, cancel, not renew, or not place business with MMA; (iii) perform or supervise the provision or performance of services or projects or provision of products of the type sold or provided by Employee while he or she was employed by MMA on behalf of any clients or prospective clients of MMA; or (iv) assist others to do the acts. Exhibit C to Exhibit E, ¶ 1(b).

69.    Buchanan also agreed that, both during employment with MMA and for a period of two (2) years thereafter, she would not, either on her own account or on behalf of any person, company, corporation, or other entity, directly or indirectly, solicit, or endeavor to cause any employee of MMA to leave employment with MMA. Exhibit C to Exhibit E, ¶ 2.

15

70.     Buchanan also agreed that, for so long thereafter as the pertinent information or documentation remains confidential, she would not, for any purpose whatsoever, directly or indirectly use, disseminate or disclose to any other person, organization or entity Confidential Information or Trade Secrets, except as required to carry out her duties as an employee of MMA. Exhibit C to Exhibit E, ¶ 5(a).

71.     The Buchanan NSA provides that the restrictive periods set forth therein shall not expire and shall be tolled during any period in which Buchanan is in violation of such restrictive periods, and therefore such restrictive periods shall be extended for a period equal to the durations of Buchanan's violations thereof. Exhibit C to Exhibit E, ¶ 10(b).

72.     The Buchanan NSA is governed by and construed in accordance with the laws of State of New York. Exhibit C to Exhibit E, ¶ 15.

73.     As consideration for the Buchanan NSA, Buchanan was offered continued employment and a significant retention bonus. *See* Exhibit E §4 and Exhibit A to Exhibit E.

**The Post-Employment Covenants Are Reasonable**

74.     The agreements are each narrowly tailored to protect MMA's legitimate business interests.

75.     MMA has a reputation for expertise in the insurance industry and has developed through great expense significant goodwill embodied in its relationships with its clients and the insurance companies whose products are sought by MMA's clients.

76.     The prohibitions on directly or indirectly soliciting, servicing or otherwise interfering with certain clients and prospective clients protects MMA's legitimate interest in its client relationships in which it significantly invested.

77.     MMA also has a legitimate interest in maintaining its relationships with its employees in whom MMA invest significant capital to train and retain the employees.

78.    The prohibitions on directly or indirectly soliciting certain MMA employees to induce them to resign their employment with MMA protects MMA's legitimate interest in its employment relationships—in which it significantly invested.

79.    MMA also has an interest in prohibiting its employees, to whom it entrusted Confidential Information, from the disclosure and use of its confidential information to lure customers and employees away from MMA.

80.    Because the insurance marketplace is a competitive industry, much of the information about MMA's business plans, products, services, employees, and clients is considered by MMA to be Confidential Information. MMA has developed and marketed an extremely operation that is highly dependent upon maintaining the secrecy of this information.

81.    Disclosing this confidential information would put MMA at a competitive disadvantage, as this information is only valuable if MMA can maintain its secrecy.

**Defendants' Coordinated Departures**

82.    On January 14, 2026, Lockton employees, including Neil Metzheiser, Chief Executive Officer of Lockton's Southeast Series, posted on LinkedIn a photo of Carter, with the title "Welcome John Carter Vice President, Risk Solutions Producer Birmingham."  Mr. Metzheiser posted "We are excited to welcome John Carter as Producer and Vice President to our Risk Solutions team in Birmingham. John brings over 20 years of experience serving clients across various industries, with deep expertise in real estate, hospitality, construction, and manufacturing." At the time of the post, Carter was a MMA employee.

83.    In short succession on that same day, Nolt, Buchanan, and Reagin, abruptly resigned.

84.    All three resignation notices were substantially similar, and all made clear that they were joining Lockton.

17

85.     Having not received a resignation letter from Carter, but having seen the LinkedIn post and the resignations of the MMA team responsible for providing services to the MMA clients tied to Carter as the Producer, MMA contacted Carter on January 15 to confirm whether it was his intent to resign from MMA.

86.     Carter confirmed, stating that he had emailed notice of his resignation to his manager on January 14, 2026 from his Gmail account.  His manager had not received the email. Mr. Carter confirmed his resignation from MMA, effective January 14, 2026.

87.     Upon information and belief, as part of the raid on MMA conducted by Defendants, Carter helped Lockton hire MMA's employees and encouraged MMA employees to leave MMA and join Lockton and coordinated their *en masse* departures, in violation of their agreement with and fiduciary duties to MMA.

88.     Given his senior level position, Carter was equipped with full knowledge of Nolt's, Buchanan's, and Reagin's salaries, bonuses and benefit information and were therefore able to offer competitive terms of employment with Lockton in order to induce them to leave their positions at MMA in favor of Lockton. Nolt, Buchanan, and Reagin devoted their time at McGriff and MMA to the execution of client needs and relationship management, largely with clients that were tied to Carter as the Producer at MMA.

89.     In or around August 2025, Carter also attempted to solicit and induce other high-level producers at MMA to engage with Lockton about joining their mass departure by directly telling them to discuss a competitive position with Lockton.

90.     Carter's actions have not ceased. It has come to MMA's attention that Carter has continued efforts to solicit MMA employees, including at least one more within the last few weeks.

18

**Former Employees' Breaches; MMA Loses Five Clients**

91.     Immediately after her resignation, Buchanan began violating her restrictive post-employment covenants.

92.     Buchanan informed a client, Client A, that she was leaving MMA to join Lockton, slandering MMA in the process.  Client A is one of MMA's largest accounts and generates a substantial portion of their revenue. Buchanan's comment prompted the President of Client A to send out a letter stating that they needed to consider doing a Request For Proposal and change brokers.

93.     Similarly, within days of his resignation, Carter was in contact with Client B via LinkedIn and discussed his new position at Lockton. As of February 17, 2026, Client B advised MMA that they would be changing brokers and moving their business to Lockton. Carter was the MMA Producer tied to Client B, with day-to-day service provided by Carter and Nolt.

94.     Upon information and belief, the other Former Employees also improperly solicited MMA's client and prospective clients.

95.     On January 22, 2026, Client C notified MMA that it was moving its business. Client C's relationship at MMA was managed by Carter. MMA later learned that Client C moved its business to Lockton. Carter was the MMA Producer tied to Client C, with day-to-day service provided by Carter and Buchanan.

96.     On February 9, 2026, Client D notified MMA that it was appointing Lockton as its broker of record. Carter was the MMA Producer tied to Client D, with day-to-day service provided by Carter and Buchanan.

97.     On February 12, 2026, Client E notified MMA that it was appointing Lockton as its broker of record. Carter was the MMA Producer tied to Client E, with day-to-day service provided by Carter and Buchanan.

98.     On March 20, 2026, Client F advised MMA that it was appointing Lockton as its broker of record. Carter was the MMA Producer tied to Client E, with day-to-day service provided by Carter and Nolt.

99.     Clients B, C, D, E,F and G provided identical, coached responses when conveying their move to Lockton, each clearly evidencing collusion with Carter, Buchanan and Nolt.

100.     Defendants' ongoing assault on MMA's business has caused, is continuing to cause, and threatens to cause, immediate, irreparable harm to MMA by, among other things, impairing MMA's goodwill and reputation with its clients, destroying MMA's established client relationships that it has invested time and resources into, destroying MMA's employee relationships, disrupting the continuity of MMA's workforce, and threatening the continued disclosure, misuse, and misappropriation of its trade secret, confidential and proprietary business information.

101.     The Former Employees present a serious threat to MMA's clients, key employees, and valuable confidential information. These efforts are underway, ongoing, and continuous. MMA is entitled to compensation because of harm directly and proximately caused by Defendants' conduct to date.

**Carter's Resignation Results in the Acceleration of Sums Owed on The Five Promissory Notes Executed by Him During the Course of His Employment**

102.     During the course of his employment, McGriff loaned Carter a sum of money (the "First Loan"), pursuant to a Promissory Note executed in McGriff's favor (the "First Promissory Note") and dated April 30, 2020.

103.     The First Promissory Note provides that the outstanding principal balance in seven equal installments on April 30th of every year, the final payment due and payable by April 30, 2027. However, if Carter remains employed through each installment payment date, the installments due and payable shall be forgiven.

104.    McGriff also loaned Carter an additional sum (the "Second Loan"), pursuant to a Promissory Note executed in McGriff's favor (the "Second Promissory Note") and dated December 10, 2021.

105.    The Second Promissory Note provides that the outstanding principal balance in five equal installments on December 31st of every year, the final payment due and payable by April 30, 2026. However, if Carter remains employed through each installment payment date, the installments due and payable shall be forgiven.

106.    McGriff also loaned Carter an additional sum (the "Third Loan"), pursuant to a Promissory Note executed in McGriff's favor (the "Third Promissory Note") and dated May 9, 2022.

107.    The Third Promissory Note provides that the outstanding principal balance in seven equal installments on May 31st of every year, the final payment due and payable by May 31, 2029. However, if Carter remains employed through each installment payment date, the installments due and payable shall be forgiven.

108.    McGriff also loaned Carter an additional sum (the "Fourth Loan"), pursuant to a Promissory Note executed in McGriff's favor (the "Fourth Promissory Note") and dated March 15, 2023.

109.    The Fourth Promissory Note provides that the outstanding principal balance in five equal installments on March 31, 2023 of every year, the final payment due and payable by March 31, 2028. However, if Carter remains employed through each installment payment date, the installments due and payable shall be forgiven.

110. McGriff also loaned Carter an additional sum (the "Fifth Loan"), pursuant to a Promissory Note executed in McGriff's favor (the "Fifth Promissory Note") and dated March 31, 2024.

111. The Fifth Promissory Note provides that the outstanding principal balance in five equal installments on March 31, 2024 of every year, the final payment due and payable by March 31, 2029. However, if Carter remains employed through each installment payment date, the installments due and payable shall be forgiven.

112. The First, Second, Third, Fourth, and Fifth Promissory Notes each provide that, if Carter voluntarily terminates his employment, the entire remaining unforgiven Principal Amounts for each respective loan shall immediately and automatically become due and payable without notice to Carter and shall accrue interest at a rate equal to the sum of four percent (4%).

113. The First, Second, Third, Fourth, and Fifth Promissory Notes each provide that each note may be assigned by McGriff, and that the benefits and obligations thereof shall inure to McGriff's successors.

114. As of the date of the closing of its acquisition of McGriff, MMA became successor-in-interest to McGriff on the First, Second, Third, Fourth and Fifth Promissory Notes.

115. Carter resigned on January 14, 2026, prior to the forgiveness of all installments for the First, Second, Third, Fourth, and Fifth Promissory Notes .

116. As such, outstanding sums are due and owing as of January 14, 2026 on the First Loan, the Second Loan, the Third Loan, the Fourth Loan; and the Fifth Loan (collectively, the "Outstanding Principal Balances").

117. Carter has failed to remit the Outstanding Principal Balances to date.

118.    The First, Second, Third, Fourth, and Fifth Promissory Notes also states that, if a claim is brought to enforce the Promissory Note, McGriff (now MMA) shall be entitled to recover from Debtor all reasonable attorneys' fees and costs and expenses.

**AS AND FOR A FIRST CAUSE OF ACTION**
*Breach of NSA Agreement – Non-Solicitation of Customers*
**(Against all Defendants)**

119.    MMA repeats and realleges every allegation in Paragraphs 1 through 117 as if set forth herein.

120.    The customer non-solicitation provisions of the NSA Agreements are valid and enforceable.

121.    MMA fully performed its obligations under the NSA Agreements.

122.    Under the NSA Agreement, Defendants are prohibited, for two years following their separation of employment with MMA, from directly or indirectly, (i) soliciting clients or prospective clients of MMA for the purpose of selling or providing products or services of the type sold or provided by them while employed by MMA; (ii) inducing clients or prospective clients of MMA to terminate, cancel, not renew, or not place business with MMA; (iii) performing or supervising the provision or performance of services or projects or provision of products of the type sold or provided by them while he or she was employed by MMA on behalf of any clients or prospective clients of MMA; or (iv) assisting others to do the acts.

123.    Defendants breached their respective NSA Agreements by soliciting at least five MMA clients with the intention of causing those clients to transfer their business from MMA to Lockton.

23

124.    As direct and proximate result of Defendants' breach, MMA has suffered and will continue to suffer irreparable injury, loss of goodwill, harm to its business, and other damages, including lost revenue, attorneys' fees, and litigation costs in an amount to be proven at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### *Breach of NSA Agreement – Non-Service of Customers*
**(Against all Defendants)**

125.    MMA repeats and realleges each and every allegation in Paragraphs 1 through 123 as if set forth herein.

126.    The employee non-service provisions of the NSA Agreements are valid and enforceable.

127.    MMA fully performed its obligations under the NSA Agreements.

128.    Under the NSA Agreement, Defendants are prohibited, for two years following their separation of employment with MMA, either on their own account or on behalf of any person, company, corporation, or other entity, directly or indirectly, from performing or supervising the provision or performance of services or projects or provision of products of the type sold or provided by them while employed by MMA on behalf of any clients or prospective clients of MMA.

129.    Defendants have serviced MMA clients in violation of their non-service provision of the NSA.

130.    As direct and proximate result of the Defendants' breaches of the non-service agreements, MMA has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.

## AS AND FOR A THIRD CAUSE OF ACTION
### *Breach of NSA Agreement – Non-solicitation of Employees*
### (Against Carter)

131. MMA repeats and realleges each and every allegation in Paragraphs 1 through 129 as if set forth herein.

132. The employee non-solicitation provisions of the NSA Agreements are valid and enforceable.

133. MMA fully performed its obligations under the NSA Agreements.

134. Under the NSA Agreement, Defendants are prohibited, for two years following their separation of employment with MMA, either on their own account or on behalf of any person, company, corporation, or other entity, directly or indirectly, from soliciting, or endeavor to cause any employee of MMA to leave employment with MMA.

135. Upon information and belief, Defendants have solicited MMA employees in violation of their non-solicitation provision of the NSA.

136. As direct and proximate result of the Defendants' breaches of the non-solicitation agreements, MMA has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.

## AS AND FOR A FOURTH CAUSE OF ACTION
### *Breach of Fiduciary Duties*
### (Against all Former Employees)

137. MMA repeats and realleges each and every allegation in Paragraphs 1 through 135 of the Complaint as if fully set forth herein.

138. Each Former Employee was employed by MMA in a position of trust and confidence.

139.    By virtue of his or her position at MMA, each Former Employee owed a fiduciary duty and a duty of loyalty to MMA both during and after his or her employment and was obligated not to divert MMA's business in which it had a tangible expectancy, and not to subvert or misappropriate MMA's confidential information and trade secrets.

140.    Each Former Employee breached his or her fiduciary duties owed to MMA by directly or indirectly soliciting or diverting MMA's clients and business opportunities, in which it had a tangible expectancy, to Lockton, a direct competitor, or soliciting and diverting MMA's employees to Lockton.

141.    As a direct and proximate result of the Former Employees' breaches of their fiduciary duties, MMA has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. MMA will continue to suffer this harm unless and until the Former Employees are restrained from taking further actions in breach of their fiduciary duties to MMA.

142.    As a direct and proximate result of the Former Employees' breaches of their duties of loyalty, MMA has suffered and will continue to suffer additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

143.    Each Former Employee committed his or her actions knowingly, willfully and in conscious disregard of MMA's rights. Thus, MMA is entitled to recover actual and exemplary damages in an amount to be determined at trial.

**AS AND FOR A FIFTH CAUSE OF ACTION**
*Breach of Contract*
**(Against Carter)**

144.    MMA repeats and realleges each and every allegation in Paragraphs 1 through 142 of the Complaint as if fully set forth herein.

26

145. On or about April 30, 2020, for valuable consideration, Carter executed and delivered to McGriff, and pursuant to the First Promissory Note, Carter agreed to pay the total sum in seven equal installments per annum, each installment to be forgiven in the event that he remained employed.

146. On or about December 10, 2021, for valuable consideration, Carter executed and delivered to McGriff, and pursuant to the Second Promissory Note, Carter agreed to pay the total sum in five equal installments per annum, each installment to be forgiven in the event that he remained employed.

147. On or about May 9, 2021, for valuable consideration, Carter executed and delivered to McGriff, and pursuant to the Third Promissory Note, Carter agreed to pay the total sum in seven equal installments per annum, each installment to be forgiven in the event that he remained employed.

148. On or about March 31, 2023, for valuable consideration, Carter executed and delivered to McGriff, and pursuant to the Fourth Promissory Note, Carter agreed to pay the total sum in five equal installments per annum, each installment to be forgiven in the event that he remained employed.

149. On or about March 31, 2024, for valuable consideration, Carter executed and delivered to McGriff, and pursuant to the Fifth Promissory Note, Carter agreed to pay the total sum in five equal installments per annum, each installment to be forgiven in the event that he remained employed.

150. The First, Second, Third, Fourth, and Fifth Promissory Notes each provide that, if Carter voluntarily terminates his employment, the entire remaining unforgiven principal amounts

of the respective Loans shall immediately and automatically become due and payable without notice to Carter and shall accrue interest at a rate equal to the sum of four percent (4%).

151.    MMA is the successor-in-interest to McGriff on the First, Second, Third, Fourth, and Fifth Promissory Notes by reason of its acquisition of McGriff and all of its assets effective November 15, 2024.

152.    By reason of Carter's resignation on January 14, 2026, there is due to MMA from Carter, Outstanding Principal Balances on the First Promissory Note, the Second Promissory Note, the Third Promissory Note, the Fourth Promissory Note, and the Fifth Promissory Note. Carter has failed to remit the Outstanding Principal Balance to date.

153.    By reason of Carter's breach of the First, Second, Third, Fourth and Fifth Promissory Notes, Carter is liable for the Outstanding Principal Balances, plus interest and attorneys' fees.

**WHEREFORE**, Plaintiff respectfully requests that judgment be made and entered against Defendants and in favor of Plaintiff as follows:

(a)    Finding that each Non-Solicitation and Confidentiality Agreements signed by the Individual Defendants is valid and enforceable.

(b)    Enjoining and restraining Defendants, and any person or entity acting in concert with them, for a period of 24 months following their terminations from employment with MMA as the Court finds appropriate based on the tolling provision of their respective NSAs and as extended during any period that Defendants have breached their obligations to Plaintiff, from directly or indirectly diverting, taking away or doing business with clients or prospective clients with whom they had any direct or indirect involvement during the 24 months immediately prior to their terminations from employment.

(c)      Enjoining and restraining Defendants, and any person or entity acting in concert with them, for a period of 24 months following their terminations from employment with MMA as the Court finds appropriate based on the tolling provision of their respective NSAs and as extended during any period that Defendants have breached their obligations to Plaintiff, from directly or indirectly diverting, performing or supervising the provision or performance of services or projects or provision of products of the type sold or provided by Former Employees employed by MMA on behalf of any clients or prospective clients of MMA.

(d)      Enjoining and restraining Defendants, and any person or entity acting in concert with them, for a period of 24 months following their terminations from employment with MMA, and as extended during any period that Defendants have breached their obligations to Plaintiff, from directly or indirectly, soliciting, inducing, recruiting or making an offer of employment to any of Plaintiff's employees who were employed at any time during the 24 months prior to Defendants' terminations from employment and with whom the Defendant had any direct or indirect involvement during the course of their employment with MMA.

(e)      Enjoining and restraining Defendants, and any person or entity acting in concert with them, from any other actions in violation of any Defendant's contractual obligations or fiduciary duties owed to Plaintiff;

(f)      Awarding compensatory damages and interest to Plaintiffs in an amount to be determined at trial;

(g)      Awarding exemplary and punitive damages; and

(h)      Granting Plaintiff its costs and disbursements incurred in connection with this litigation, including attorneys' fees, together with such other further relief as the Court may deem just and proper.

Dated: June 12, 2026
      New York, New York

LITTLER MENDELSON, P.C.

/s/ *A. Michael Weber*

A. Michael Weber
Shawn Matthew Clark
Sara Aylin Elgndy
900 Third Avenue
New York, NY 10022
(212) 583-9600
MWeber@littler.com
SMClark@littler.com
SElgndy@littler.com

*Attorneys for Plaintiff*

30